APPEAL OF GRANT TRUST AND SAVINGS CO., TRUSTEE OF ESTATE OF ANDREW SCHICK, DECEASED.

Docket No. 3659.   Submitted July 14, 1925.   Decided March 10, 1926.

The fair market value of certain shares of stock determined.

*Forrest D. Siefkin, Esq.,* for the taxpayer.
*Lee I. Park, Esq.,* for the Commissioner.

Before MARQUETTE and MORRIS.

This is an appeal from the determination of a deficiency in income tax for the year 1919 in the amount of $25,632.86.

The single question is whether the taxpayer realized a gain on the sale of stock as determined by the Commissioner, or a loss as contended by the taxpayer.

FINDINGS OF FACT.

The taxpayer is an Indiana corporation, with office at Marion, and is the duly appointed trustee of the estate of Andrew Schick, deceased. As such trustee it had full management and control of the

entire personal property of said estate under the direction of the Circuit Court of Grant County, Indiana, during the life of the widow of said Andrew Schick, deceased. The widow is still living.

Andrew Schick died on October 25, 1914, possessed of 470 shares of stock of the Western Drop Forge Co., a corporation in which the stock was closely held and which was organized in 1909. No sales of the stock occurred in the open market prior to October 25, 1914. All of the stock in the company was sold in 1919, and the taxpayer then received $172,268.85 for the stock held by it as trustee, the number of shares having been increased to 881¼ by reason of stock dividends.

The Commissioner determined the fair market value of the stock on October 25, 1914, as $86,679.66, with a resulting profit on the sale of $85,364.29.

The Western Drop Forge Co. was engaged in the manufacture of drop forgings, and had among its customers many of the automobile manufacturers. It had a capital stock on March 1, 1913, of $75,000 par value, all of which was held by five individuals. At the time of decedent's death the capital stock was $160,000. On April 15, 1919, the date of sale, the capital stock was $300,000 par value, the increase during the six years being entirely by way of stock dividends.

The average net tangible assets at June 30th in the years 1911 to 1918, inclusive, were as follows:

| | | | |
|---|---|---|---|
| 1911 | $153,328.68 | 1915 | $307,531.43 |
| 1912 | 196,694.31 | 1916 | 403,516.85 |
| 1913 | 238,188.75 | 1917 | 471,342.61 |
| 1914 | 271,121.39 | 1918 | 612,918.00 |

The average for the years 1911 to 1914, inclusive, is $214,833.28.

The annual earnings of the company were:

| | | | |
|---|---|---|---|
| 1911 | $49,949.49 | 1915 | $59,561.91 |
| 1912 | 71,365.78 | 1916 | 158,008.93 |
| 1913 | 65,707.10 | 1917 | 320,491.40 |
| 1914 | 28,758.17 | 1918 | 266,649.63 |

The average for the years 1911 to 1914, inclusive, is $53,945.14.

Cash dividends were paid as follows:

| | | | |
|---|---|---|---|
| June 30, 1913 | $6,000.00 | Oct. 24, 1914 | $4,800.00 |
| July 19, 1913 | 1,500.00 | June 30, 1915 | 1,600.00 |
| Aug. 19, 1913 | 1,600.00 | June 30, 1916 | 2,492.42 |
| Sept. 19, 1913 | 1,600.00 | June 30, 1916, to Dec. 19, | |
| June 30, 1914 | 14,400.00 | 1916 | 140,000.00 |

The entire capital stock of par value of $300,000 had a book value in 1919, at the time of the sale, of $725,560.96. The total sales price received for all of the stock on the sale in 1919 was $592,000. No good will value was carried on the books.

In 1916 the capital stock was $300,000 par value and the surplus $275,760.37. On April 15, 1919, the capital stock was $300,000 and the surplus $373,163.11. The stockholders received an offer of $750,-000 for their stock in connection with a contemplated merger of the company with several other companies. The sale was not consummated because one of the other companies refused to join in the merger. Between 1916 and 1919 the general manager of the Western Drop Forge Co. died and two other officers and stockholders withdrew from the company. During the war years the company, at the request of the Government and in order to facilitate war production, divulged to competitors certain of its secret processes. Competition greatly increased during the years 1916 to 1919, and, in the sale which finally occurred in 1919, no consideration was given for good will value.

The only sale of the company's stock prior to 1919 was one on August 19, 1913, to an employee whose services the company desired to retain. That sale was of treasury stock at par. At the date of the death of Andrew Schick, October 25, 1914, the outstanding capital stock of the company was $160,000 and the book surplus was $135,079.70. The book value of the 470 shares in question on October 25, 1914, was $86,679.66.

The surplus of the company on June 30, 1918, was $479,887.46. The surplus on April 15, 1919, was $373,163.11. The last stock dividend was under date of December 20, 1916, and the reduction in surplus between June 30, 1918, and April 15, 1919, was made up of dividends, Federal taxes, and a net operating loss of about $44,000 in the period June 30, 1918, to April 15, 1919.

The fair market value of the 470 shares on October 25, 1914, was $119,072.06.

OPINION.

MARQUETTE: The only question presented herein is the value of certain shares of stock of the Western Drop Forge Co. at the date of the death of the decedent stockholder, to-wit, October 25, 1914, for the purpose of determining the gain or loss on the subsequent sale thereof in the year 1919. The taxpayer contends that there was a good will value at the date of death, based on earnings prior thereto, attributable proportionally to the stock, which compels a higher valuation than results from the use of book value only. The Commissioner valued the stock at its book value. He declined to include in such valuation any good will value and determined a gain of $85,364.29 on the sale in 1919. The taxpayer claims it sustained a loss of $5,657.18.

The stock of the corporation was closely held and there were no sales thereof in the open market prior to the decedent's death. We have found that the average net assets of the corporation over the

four-year period from 1911 to 1914 were $214,833.28, and the average earnings over the same period were $53,945.14. There was an addition to surplus between June 30, 1914, and the date of death of $14,129.23, which, added to the capital and surplus as of June 30, 1914, gave the stock a book value of $295,079.70 at the date of death, or $184.43 per share.

In the valuation of closely held stock the book value must serve as a basis, if the result, as stated by one court, is to be anything more than a " dignified guess." In *In re Dupignac's Estate*, 204 N. Y. S. 273, 279, the court stated the following basis for valuing closely held securities:

The method adopted by the courts in arriving at the fair or clear market value of closely held securities is sound. It is to value the corporate assets in the manner that a buyer would value them; to ascertain the cash value of the property which the shares represent, assigning to each share its proportionate worth. The book value of stock is its intrinsic value. If there have been no sales, the assessor must necessarily fall back upon the book value as the nearest approximation to the fair market value. In the absence of sales, the book value must be taken as the basis of computation. Any other rule would be illogical, and create an impotent conclusion. The use of the words " fair market," or " clear market " value, when applied to closely held stock, is meaningless. Because there is no market to guide, such stock must be appraised at its value in money—its intrinsic worth. It can only be compared and measured in money value, according to the assets as shown by the balance sheet, less liabilities. The assets of the balance sheet is the inventory value. Authorities in abundance support this method. [Citing cases.] The method adopted in these cases has been followed in *Matter of Felton*, 176 Cal. 663, 169 Pac. 392.

At page 281 the court said:

The courts in this country have not adopted any inflexible rule for ascertaining the value of good will. They have decided that the value of good will may be fairly arrived at by multiplying the average net profits for a number of years by a number of years purchase, such number being suitable and proper, having regard to the nature and character of the business as a question of fact, depending upon the facts in each case.

In New York the return on the tangible net assets is usually computed at 6 per cent, and the amount thereof is deducted from the average earnings to determine the average net earnings attributable to intangibles. No reason appears from the authorities in that State why this return should not be a variable, dependent upon the risk in the enterprise, the value of money, and other relevant facts. In our opinion the New York rule is basically sound, but we believe that the fair rate of return on tangible assets must be ascertained from the facts in each case before the average net earnings attributable to intangibles are capitalized to determine good will value, and the fixing of this rate of return is itself a question of fact. The same authorities hold that the number of years purchase to be used in determining

good will value is a question of fact, depending upon all the facts of each case, and there is no set years of purchase by which to multiply the average profits. This necessarily follows if the rule is to be anything more than a mere formula.

The taxpayer herein claims a rate of 8 per cent on net tangibles and capitalizes the net earnings at 15 per cent. In view of the facts, we believe an 8 per cent rate on tangibles is fair, but to capitalize the net earnings at 15 per cent to determine good will value is, in the light of the facts, exorbitant. Considering the facts that the corporation had been in existence but four and one-half years, that its earnings had decreased largely in 1913 and 1914 from the previous year, and that the dividends paid to the basic date herein were small, we believe that a three-year purchase of the net earnings would fairly represent the value of good will. In arriving at this conclusion we have not overlooked the fact that the corporation had a secret process claimed to have been of value in its business.

Applying these rates, we find that 8 per cent on the average net tangible assets is $17,186.66, which, subtracted from the average net earnings of $53,945.14, gives $36,758.48 as the part of the net earnings attributable to intangibles. Multiplying the average net earnings attributable to intangibles by 3, the number of years purchase, results in a good will value to the corporation of $110,275.44. The number of shares outstanding in 1914 was 1,600, making the proportional amount of good will attributable to each share $68.92. This latter figure multiplied by 470, the number of shares owned by the decedent, shows the proportional good will therein to have been $32,392.40, which, added to the book value of these shares of $86,679.66, gives a value to the shares in question of $119,072.06. The stock was sold in 1919 for $172,268.85, and a gain was realized on this sale in the amount of $53,196.79.

*Order of redetermination will be entered on 15 days' notice, under Rule 50.*